**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TRACEY PAVLICIN** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **CAPTECH VENTURES, INC.** | : | **NO. 24-5415** |

**<u>MEMORANDUM OPINION</u>**

**Savage, J.**                                          **December 18, 2025**

In this action for disability discrimination and retaliation under the Americans with Disabilities Act ("ADA") and interference and retaliation under the Family Medical Leave Act ("FMLA"), the critical issue is whether defendant CapTech Ventures, Inc. ("CapTech") terminated plaintiff Tracey Pavlicin as part of a reduction-in-force ("RIF") because she would need a three-month recuperation period after undergoing a kidney transplant. What and when CapTech knew about her kidney condition and imminent transplant is at the center of the dispute.

Moving for summary judgment, CapTech argues there is no evidence that the CapTech decisionmaker was aware of Pavlicin's medical condition when he selected her for termination or that CapTech terminated her as a result of discriminatory or retaliatory animus. CapTech also argues that Pavlicin's FMLA interference and ADA failure to accommodate claims fail because she did not request leave or an accommodation.

Opposing the motion, Pavlicin points to evidence that CapTech knew of her medical condition and her need to take leave when she was selected for termination as a part of the RIF. Pavlicin argues a reasonable jury could disbelieve CapTech's stated

reasons for terminating her, citing inconsistencies in the testimony of CapTech's employees and their inability to explain why Pavlicin was selected.

CapTech employees have given contradictory accounts about who knew and when they knew of Pavlicin's upcoming kidney transplant and need for leave. Additionally, the decisionmaker cannot adequately explain why he selected her for termination. A jury must resolve these questions. There is no dispute that Pavlicin did not request an accommodation. Therefore, we shall deny summary judgment on the ADA discrimination and the FMLA interference and retaliation claims, and grant it on the ADA accommodation and retaliation claims.

## Background

Pavlicin began working for CapTech, a technology consulting firm, as a manager in its management consulting practice area in May 2017.[1] She had IgA nephropathy, a chronic kidney disease.[2] By 2021, her disease deteriorated to the point she required a kidney transplant.[3] Pavlicin shared information about her medical condition with coworkers, including Virginia Bray, her "coach."[4] As Pavlicin's "coach," Bray served in a quasi-supervisory and career development role.[5] Pavlicin told Bray about her kidney

---

[1] Defendant's Statement of Undisputed Material Facts in Support of Defendant's Motion for Summary Judgment ["Def.'s SUMF"] ¶ 15, ECF No. 30-1 (attached to Memorandum of Law In Support of Defendant's Motion for Summary Judgment ["Def.'s Mot. Summ. J."], ECF No. 30); Plaintiff's Response to Defendant's Proposed Statement of Undisputed Material Facts ["Pl.'s RSUMF"] ¶ 15, ECF No. 32-3 (Attached to Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ["Pl.'s Opp'n Mot. Summ. J."], ECF No. 32).

[2] Plaintiff's Statement of Additional Facts in Support of Her Opposition to Defendant's Motion for Summary Judgment ["Pl.'s SOF"] ¶¶ 12–13, ECF No. 32-4 (attached to Pl.'s Opp'n Mot. Summ. J., ECF No. 32).

[3] Pl.'s SOF ¶ 13, ECF No. 32-4.

[4] *Id.* ¶ 5.

[5] Bray Dep. 15:10–18, ECF Nos. 30-17, 32-8; Pavlicin Dep. 19:10–20, ECF Nos. 30-4, 32-5.

condition in early 2022.[6]   Later that year, she informed her that she was a kidney transplant candidate.[7]

*Leave Inquiry*

In anticipation of her kidney transplant, Pavlicin emailed CapTech's Benefits Department on November 2, 2022.  She wrote:

> Just wanted to reach out and get more information on long term leave. I'm not sure when, but in the upcoming months I will be undergoing a kidney transplant. Timing depends on when a viable kidney becomes available, which could happen fairly quickly. Can you tell me what the process is for taking leave (I'll need 3 months recovery time) so I am prepared when the time comes?[8]

The following day, Human Resources Benefits Manager Erin Gill emailed Pavlicin information and instructions for requesting short-term disability and FMLA leave.[9]   Gill advised:

> You may want to wait to initiate a claim until you have expected leave dates, but if you want to get the process started so you don't have to worry about this closer to the date or after the procedure then I would suggest entering a tentative leave start and end date.[10]

The two exchanged additional emails on November 4, 2022.   Gill answered Pavlicin's follow-up questions about the process for initiating a leave claim with CapTech's leave management vendor, Prudential.[11]  Pavlicin did not request disability or

---

[6] Bray Dep. 51:17–54:1, ECF Nos. 30-17, 32-8.

[7] *Id*.

[8] Pl.'s RSUMF ¶ 22, ECF No. 32-3; Pl.'s Ex. 10, Pavlicin Email Nov. 2, ECF No. 32-14.

[9] Pl.'s RSUMF ¶ 23, ECF No. 32-3; Pl.'s Ex. 11, Gill Email Nov. 3, DEF 00929, ECF No. 32-15.

[10] Pl.'s Ex. 11, Gill Email Nov. 3, DEF 00929, ECF No. 32-15.

[11] Pl.'s Ex. 37, Pavlicin/Gill Emails Nov. 4, DEF 01033–34, ECF No. 32-41.

leave benefits.  There was no communication between her and the Benefits Department after November 4, 2022, until February 1, 2023**,** when she was terminated and promptly reinstated.[12]

*The Bench and Reduction-in-Force*

On December 30, 2022, the contract for the work Pavlicin had been doing expired. Two days later, CapTech placed her on "the bench," the term used by CapTech to describe employees who are not staffed to a client and are awaiting an assignment.[13] Those on the bench remain on the payroll.

In January 2023, CapTech executive leadership initiated a reduction-in-force (RIF) to reduce the cost of the bench.[14]  Management Consultant Lead David DeHaven was charged with selecting 20 to 25 employees on the bench for termination.[15]

The stated criteria CapTech used to select employees for the RIF were an employee's time on the bench, performance, time at level, individual skill set, and business needs.[16]  DeHaven prepared a spreadsheet to track those employees he considered selecting for the RIF.[17]  It included the "basis" for choosing each candidate for separation.[18]  On January 22, 2023, DeHaven emailed the spreadsheet to Dawn Davis, Human Resources Manager, and Brandi Cooper, Human Resources Business Partner,

---

[12] Pl.'s RSUMF ¶ 25, ECF No. 32-3.

[13] *Id*. ¶¶ 32, 34, 38.

[14] *Id*. ¶¶ 47–49.

[15] *Id*. ¶ 54; Apostolides Dep. 125:11–16, ECF Nos. 30-12, 32-21.

[16] Def.'s SUMF ¶ 56, ECF No. 30-1.

[17] Pl.'s Ex. 21, DeHaven Email Jan. 22, ECF No. 32-25; Pl.'s Ex. 23, Candidates for Separation Spreadsheet, ECF No. 32-27.

[18] Pl.'s Ex. 23, Candidates for Separation Spreadsheet, ECF No. 32-27.

with a message stating, "Plan to review this with you in the morning before making any final edits and sending to Katy [Apostolides]."[19]  Line #14 of the spreadsheet lists the "basis" for choosing Pavlicin as skill surplus, time at level, and "other."[20]

On February 1, 2023, Davis and Tiffany Erbach, Managing Director, notified Pavlicin that she was being terminated.[21]  Pavlicin informed Davis and Erbach that she had previously contacted the Benefits Department about her pending transplant and had requested information about long term leave.[22]  Davis and Erbach spoke with the Benefits Department about Pavlicin's leave inquiry.[23]  Later that day, Davis advised Pavlicin that she was not laid off, stating:

> At this time you are still on payroll but I would hold off on doing anything internal, unless you want to. I just am not sure how you say oh I am not laid off or maybe say I am not laid off but will be taking a leave in the near future and I misunderstood? I am not sure how to handle it but to answer your question, no you are not laid off.[24]

### Special Dispensation

On February 8, 2023, in an email to Davis, Pavlicin advised that "the doctor wasn't really able to tell me definitively when it'll [the transplant] happen."[25]  Two weeks later, Davis asked if Pavlicin had any updates about the transplant.[26]  The following day, the

---

[19] Pl.'s Ex. 21, DeHaven Email Jan. 22, ECF No. 32-25.

[20] *Id.*

[21] Pl.'s RSUMF ¶ 59, ECF No. 32-3.

[22] *Id.* ¶ 60.

[23] *Id.* ¶ 61.

[24] Pl.'s Ex. 28, Davis Email Feb. 1, ECF No. 32-32.

[25] Pl.'s Ex. 30, Pavlicin Email Feb. 8, ECF No. 32-34.

[26] Pl.'s Ex. 32, Davis Email Mar. 7, DEF 00282, ECF No. 32-36.

two discussed the possibility of Pavlicin taking short-term disability, FMLA leave, or accepting termination.[27]  Pavlicin stated she would follow up with Gill to determine if short-term disability was an option.[28]  She did not contact Gill.[29]  Instead, on February 24, 2023, she emailed Davis saying, "I do not want to resign. Although I'm on dialysis, I'm ready, willing, and able to work…."[30]  She also requested to see all options available to her "formally laid out" in an email.[31]  Gill emailed Pavlicin on February 28, 2023, reminding her about the process for initiating short-term disability and requesting FMLA leave.[32] Pavlicin did not respond.

On March 7, 2023, Davis sent an email to Pavlicin presenting her with three options: (1) apply for short-term disability which would require medical documentation of her need to be absent from work; (2) take an unpaid medical leave of absence for 12 weeks which would allow her to keep her benefits and remain eligible for short-term disability during her transplant and recovery period if surgery were to take place during the 12 weeks; or (3) accept termination and receive six weeks of severance pay and benefits, followed by CapTech subsidized COBRA coverage for six months.[33]

---

[27] Apostolides Dep. 242:10–243:10, ECF Nos. 30-12, 32-21.

[28] Pl.'s Ex. 32, Davis Email Mar. 7, DEF 00282, ECF No. 32-36.

[29] *Id.*

[30] Pl.'s Ex. 31, Pavlicin Email Feb. 24, ECF No. 32-35.

[31] *Id.*

[32] Pl.'s RSUMF ¶ 73, ECF No. 32-3; Pl.'s Ex. 32, Gill Email Feb. 28, DEF 00283, ECF No. 32-36.

[33] Pl.'s RSUMF ¶ 75, ECF No. 32-3; Pl.'s Ex. 32, Davis Email Mar. 7, DEF 00282, ECF No. 32-36.

Pavlicin did not respond to the March 7, 2023 email.  Nor did she select any option offered or make any alternative requests.[34]  Instead, on March 8, 2023, her attorneys contacted CapTech and requested that all future communications be directed to them.[35]

On April 7, 2023, CapTech provided Pavlicin with a separation letter notifying her that her employment was terminated, effective that day.[36]  The letter advised that her health benefit plan would expire on April 30, 2023.[37]  It further stated,

> CapTech granted you special dispensation to remain employed long enough to confirm when your surgical procedure would be scheduled and to consider the options proposed by CapTech related to that surgery. You have not responded to CapTech's verbal and written attempts to accommodate you, nor have you performed any duties for CapTech.[38]

Pavlicin learned that a kidney match had become available in May and she underwent a kidney transplant on June 20, 2023.[39]  She filed her complaint in this court on October 9, 2024.

## Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Judgment will be entered against a party who fails to sufficiently establish any element essential to that party's case and who bears the ultimate

---

[34] Pl.'s RSUMF ¶ 76, ECF No. 32-3.

[35] Pl.'s Ex. 33, Montgomery McCracken Email Mar. 8, ECF No. 32-37.

[36] Pl.'s RSUMF ¶ 77, ECF No. 32-3.

[37] Pl.'s Ex. 34, Termination Letter, ECF No. 32-28.

[38] *Id.*

[39] Pl.'s SOF ¶ 101, ECF No. 32-4.

burden of proof at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Gillispie v. RegionalCare Hosp. Partners Inc.*, 892 F.3d 585, 592 (3d Cir. 2018) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)).

In examining a motion for summary judgment, we must view the facts in the light most favorable to the nonmovant and draw all reasonable inferences in her favor.  *Peroza-Benitez v. Smith*, 994 F.3d 157, 164 (3d Cir. 2021) (citing *Santini v. Fuentes*, 795 F.3d 410, 419 (3d Cir. 2015)).  Disagreements over what inferences may be drawn from the facts, even undisputed ones, preclude summary judgment.  *Revock v. Cowpet Bay W. Condo. Ass'n*, 853 F.3d 96, 112 (3d Cir. 2017) (citing *Windsor Sec., Inc. v. Hartford Life Ins. Co.*, 986 F.2d 655, 659 (3d Cir. 1993)).

Credibility determinations, the drawing of legitimate inferences from facts, and the weighing of evidence are matters left to the jury.  *In re Asbestos Prod. Liab. Litig. (No. VI)*, 822 F.3d 125, 135–36 (3d Cir. 2016) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  Bare assertions, conclusory allegations or suspicions are not sufficient to defeat summary judgment.  *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288–89 (3d Cir. 2018) (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014)).

**Analysis**

**ADA Discrimination[40]**

Because Pavlicin relies on a pretext theory of discriminatory animus to support her discrimination claims, they are governed by the burden-shifting *McDonnell Douglas* analysis. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973); *Qin v. Vertex, Inc.*, 100 F.4th 458, 472–73 (3d Cir. 2024). Pavlicin must first establish a *prima facie* case of discrimination. *Fowler v. AT&T, Inc.*, 19 F.4th 292, 299 (3d Cir. 2021); *McDonnell Douglas Corp.*, 411 U.S. at 802. If she succeeds in establishing a *prima facie* case, the burden shifts to CapTech to "articulate a legitimate nondiscriminatory reason for the adverse employment action." *Willis v. UPMC Children's Hosp. of Pitts.*, 808 F.3d 638, 644 (3d Cir. 2015) (quoting *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 412 (3d Cir. 1999)). If CapTech satisfies its burden, Pavlicin must produce evidence either discrediting CapTech's proffered justification or showing that she was eliminated for a discriminatory reason. *Lupyan v. Corinthian Colls. Inc.*, 761 F.3d 314, 324 (3d Cir. 2014) (citing *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994)).

*Prima Facie Case*

Establishing a *prima facie* case of discrimination "is not onerous and poses a burden easily met." *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 365 (3d Cir. 2008) (internal quotation marks omitted) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). The determination of whether a *prima facie* case has been

---

[40] The same liability standards for the ADA apply to PHRA and PFPO claims. *See Ahern v. Eresearch Tech., Inc.*, 183 F. Supp. 3d 663, 668 (E.D. Pa. 2016) (interpreting the ADA, PHRA, and PFPO discrimination claims in a similar fashion); *Hanafy v. Hill Int'l, Inc.*, 669 F. Supp. 3d 419, 433 n.4 (E.D. Pa. 2023) (citing *Oden v. SEPTA*, 671 F. App'x 859, 862 n.4 (3d Cir. 2016)).

established is, under most circumstances, a question of law for the court. *Wishkin v. Potter*, 476 F.3d 180, 185 (3d Cir. 2007) (citing *Sarullo v. United States Postal Serv.*, 352 F.3d 789, 797–98 (3d Cir. 2003) (per curiam)).

To prevail on a claim for discrimination under the ADA, Pavlicin must prove: (1) she is disabled within the meaning of the ADA; (2) she is otherwise qualified to perform the essential functions of her job, with or without reasonable accommodations; and (3) she has suffered an adverse employment action as a result of discrimination. *Morgan v. Allison Crane & Rigging LLC*, 114 F.4th 214, 221 (3d Cir. 2024) (quoting *Eshleman v. Patrick Indus., Inc.,* 961 F.3d 242, 245 (3d Cir. 2020)).

CapTech does not dispute Pavlicin is disabled.[41]  Nor does it explicitly dispute she is a qualified individual.  It disputes she was terminated because of her disability.[42]  CapTech contends DeHaven was the sole decisionmaker in terminating Pavlicin and that he was unaware of her disability or the specifics of it when he selected her for termination.[43]  It further argues there is no evidence DeHaven harbored discriminatory animus towards Pavlicin.[44]

DeHaven was the decisionmaker for the February 1, 2023, RIF terminations.  Others, including Erbach and Davis, contributed their thoughts and opinions.  But, they did not have decision-making authority.  Pavlicin includes as decisionmakers the CFO and the CEO because they had final approval.  There is no evidence the CFO and the

---

[41] Def.'s Mot. Summ. J. 5, ECF No. 30.

[42] *Id*. at 5, 7.

[43] *Id*. at 5.

[44] *Id*. at 7.

CEO had any knowledge of Pavlicin's condition and leave concerns.

CapTech witnesses have given conflicting testimony regarding DeHaven's knowledge of Pavlicin's kidney condition when he decided to include her in the RIF. Despite his insistence that he did not know about it, other CapTech employees maintain, explicitly or implicitly, that he did.   Erbach informed DeHaven of Pavlicin's condition during discussions about whom to select for termination.  She testified he specifically asked her about Pavlicin during a RIF discussion.[45]  Erbach stated that "[i]t was definitely brought up as part of the conversation that she had a health condition…."[46]

Bray was aware of Pavlicin's medical condition in early 2022, and her need for dialysis and a kidney transplant in late 2022.[47]  She spoke to DeHaven in December 2022 regarding Pavlicin's performance.[48]  She testified that she was unsure if she knew of Pavlicin's need for dialysis and a transplant at the time of that conversation.[49]  She did not deny they discussed Pavlicin's kidney condition or her need for dialysis and a transplant.[50]  She just did not recall doing so.  She also did not recall speaking with Lynn Feldmann, Project Management Services Offering Lead, about Pavlicin's condition.[51]  Yet, there are text messages between her and Feldmann discussing Pavlicin's kidney

---

[45] Erbach Dep. 12:6–13:8, ECF No. 32-22.

[46] Id. at 50:21–51:2.

[47] Bray Dep. 51:21–53:20, ECF Nos. 30-17, 32-8.

[48] Id. at 55:22–56:6.

[49] Id. at 57:6–10.

[50] Id. at 57:15–23.

[51] Id. at 80:6–81:12.

condition in January 2023.[52]

Feldmann testified she became aware of Pavlicin's medical condition on January 6, 2023, when she met with Pavlicin to understand her qualifications for future staffing opportunities.[53]  On January 12, 2023, Feldmann texted Bray, "I had a check in with her. The kidney transplant thing sounds rough … I actually need to talk to HR on how to best approach that one. She is going to need 2-3 months off to recover. It's going to be hard the [sic] staff that, but also I don't want to intentionally not staff her and bring in a lawsuit."[54]  Feldmann testified that she spoke to Erbach about Pavlicin's medical condition and her need for leave before Pavlicin was terminated on February 1, 2023.[55]

DeHaven testified he knew nothing about Pavlicin's medical condition until approximately May 2025.[56]  Davis, Erbach, and Human Resources Director Katherine Apostolides testified that they had spoken to DeHaven on February 1 or 2, 2023, about Pavlicin's kidney condition and her need for a transplant.[57]  Erbach went so far as to accuse him of perjuring himself during his testimony.[58]

If the jury finds DeHaven did not tell the truth about his knowledge of Pavlicin's disability, it could conclude his reason for terminating her was because she had a

---

[52] Bray Dep. 144:14–146:10, ECF Nos. 30-17, 32-8; Pl.'s Ex. 16, Bray/Feldmann Text Messages, DEF 04720, ECF No. 32-20.

[53] Feldmann Dep. 45:16–48:11, 87:10–88:1, 89:3–8, ECF No. 32-19.

[54] Feldmann Dep. 85:23–88:17, ECF No. 32–19; Pl.'s Ex. 16, Bray/Feldmann Text Messages, DEF 04720, ECF No. 32-20.

[55] Feldmann Dep. 55:16–57:9, ECF No. 32-19.

[56] DeHaven Dep. 102:10–103:10, ECF Nos. 30-14, 32-7.

[57] Erbach Dep. 157:15–158:15, ECF No. 32-22; Apostolides Dep. 62:20–63:23, ECF Nos. 30-12, 32-21; Davis Dep. 33:12–34:3, 172:4–175:24, ECF No. 32-17.

[58] Erbach Dep. 197:15–23, ECF No. 32-22.

disability.  A jury could find that it would have been difficult for CapTech to staff her due to her need for a transplant and absence from the workforce.  Feldmann said so in her text to Bray on January 12, 2023, when she wrote that it would be hard to staff her.[59]  A jury could infer that DeHaven's terminating other employees who had taken FMLA leave within the previous two years suggests that he selected Pavlicin because her medical condition would require leave in the future, impacting CapTech's ability to staff her.

In summary, Pavlicin has produced evidence that the decision to terminate her was based on her disability.  There is evidence that DeHaven knew she had a kidney condition requiring an absence from the workplace and he selected for termination other employees who had recently used medical leaves of absence.  Thus, she has shown that a jury could reasonably find he knew of her disability and decided to terminate her because of it.

*Legitimate Non-Discriminatory Reason*

Pavlicin having made out a *prima facie* case, the burden shifts to CapTech to "articulate a legitimate nondiscriminatory reason" for terminating her.  *Willis*, 808 F.3d at 644 (quoting *Jones*, 198 F.3d at 412).  CapTech's burden is "relatively light."  *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013) (citing *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006)).  It can satisfy its burden by introducing evidence "which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason."  *Id.*

The burden is one of production not of persuasion.  *Stanziale v. Jargowsky*, 200 F.3d 101, 105 (3d Cir. 2000).  CapTech "need not prove that the tendered reason *actually*

---

[59] Pl.'s Ex. 16, Bray/Feldmann Text Messages, DEF 04720, ECF No. 32-20.

motivated" its decision.  *Fuentes*, 32 F.3d at 763 (emphasis in original).  It may satisfy its burden if it "articulates any legitimate reason for the [adverse employment action] …." *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 189 (3d Cir. 2003) (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997)).

A RIF, if applied objectively and in a non-discriminatory manner, may be a legitimate business reason for termination.  *Fowler*, 19 F.4th at 302.  Apostolides explained that CapTech's Executive Management Committee notified her of the need to conduct a RIF, targeting around 25 employees.[60]  It was implemented to reduce the cost of maintaining the bench.[61]  Further, DeHaven's spreadsheet included skill surplus and time at level as the basis for Pavlicin's selection to the RIF.[62]

CapTech has articulated a legitimate and non-discriminatory reason for terminating Pavlicin – the RIF and her meeting certain criteria for termination.

*Pretext*

Given this legitimate, non-discriminatory reason for Pavlicin's termination, the burden shifts back to Pavlicin to discredit CapTech's proffered justification or present evidence that she was terminated for a discriminatory reason.  *Lupyan*, 761 F.3d at 324 (citing *Fuentes*, 32 F.3d at 763).  She may discredit the proffered reason by demonstrating "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons' to satisfy the factfinder that the employer's

---

[60] Pl.'s RSUMF ¶¶ 47–49, ECF No. 32-3.

[61] *Id.* ¶ 48.

[62] Pl.'s Ex. 23, Candidates for Separation Spreadsheet, ECF No. 32-27.

actions could not have been for nondiscriminatory reasons." *Willis*, 808 F.3d at 644–45 (quoting *Fuentes*, 32 F.3d at 765).

Pavlicin can meet her burden by producing evidence from which a factfinder could conclude that her termination was more likely than not the result of discrimination. *Id.* at 645 (citing *Fuentes*, 32 F.3d at 764). Examples of such evidence include previous acts of discrimination against the plaintiff, discrimination against other persons within the plaintiff's protected class or within another protected class, or a showing that the defendant treated similarly situated non-members of the protected class more favorably. *Id.* In other words, Pavlicin must proffer evidence, direct or circumstantial, from which a factfinder could reasonably disbelieve CapTech's articulated legitimate reasons or believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of CapTech's action. *Burton*, 707 F.3d at 427.

Why Pavlicin was selected for termination is suspect. As we have noted, there is evidence that DeHaven knew about her kidney condition and he viewed it as a staffing concern. The legitimacy of the RIF does not explain why Pavlicin was selected when others with the same skillset were not. In CapTech's answers to interrogatories, it stated she "was advised that her employment was terminated *solely* because of a lack of work…."[63] Yet, the answer also mentions she was on the bench for one month, there was a surplus of consultants with her skillset, and she performed at the bottom 20% of employees in management positions.[64]

The evidence contradicts this explanation. Pavlicin testified that during the

---

[63] Pl.'s Ex. 22, Def.'s Answers and Objs. to Pl.'s Interrogs. – Set 1 at 3, ECF No. 32-26.

[64] *Id.*

February 1, 2023, termination meeting, she was told her termination was not performance related.[65]  DeHaven's spreadsheet did not mention Pavlicin's performance as a basis.  It referenced only "Skill Surplus / other. Time @ level."[66]  This is significant because the spreadsheet included unsatisfactory performance comments for 23 of the 26 candidates.[67]

In his deposition, DeHaven could not explain why Pavlicin was included in the RIF using his own criteria or what the "other" factor was.

Q: Okay. Why was Miss Pavlicin's employment terminated?

A: I don't have a specific -- I don't have an answer to that or I don't recall."[68]

Q: [Alright], so tell me every reason why Miss Pavlicin was terminated?

A: I don't know that I can give you every reason. It is right here. There's a skill surplus. Her time at level.[69]

Q: And what about time at level caused you to want to terminate Miss Pavlicin?

A: Time at level did not cause me to want to terminate Miss Pavlicin. It was one data point.[70]

Q: So what about Miss Pavlicin, what does the "other" refer to under, next to her name?

---

[65] Pavlicin Dep. 186:3–4, ECF Nos. 30-4, 32-5.

[66] Pl.'s Ex. 23, Candidates for Separation Spreadsheet, ECF No. 32-27.

[67] *Id.*

[68] DeHaven Dep. 21:23–22:2, ECF Nos. 30-14, 32-7.

[69] *Id.* at 171:14–22.

[70] *Id.* at 180:5–10.

A: Yeah, I -- same, the same explanation. I don't know that it was anything specific. In fact, I'm pretty sure that it wasn't. It was more skills. It was just a category with skill surplus.[71]

Q: Mr. DeHaven, I want to go back to P-35, which is the February 13th, 2023 bench report. I organized it where I pulled a number of individuals who had a PM functional skill set.

…

Do you know why any of these individuals were retained over Miss Pavlicin?

A: I don't recall.[72]

That DeHaven terminated two employes on FMLA leave at the time of the RIF and at least five who had used FMLA leave within the prior two years suggests a discriminatory animus.[73] This evidence supports the inference that he was biased against employees who took leave because they were more difficult to staff to projects. A reasonable juror could infer he terminated Pavlicin because of her medical condition and her taking leave in the future. Her condition could have been the inexplicable "other" listed reason for termination.

There is a genuine dispute about why DeHaven selected her for the RIF. Pavlicin has demonstrated inconsistencies in the testimony of CapTech employees about DeHaven's knowledge of Pavlicin's condition and his explanation (or lack of) for his

---

[71] DeHaven Dep. 251:3–9, ECF Nos. 30-14, 32-7.

[72] *Id.* at 211:4–19.

[73] *Id.* at 285:20–289:21, 290:19–291:8; Pl.'s Ex. 20, Employee Leave History Spreadsheet, ECF No. 32-24; Pl.'s Ex. 23, Candidates for Separation Spreadsheet, ECF No. 32-27.

selecting her.  These inconsistencies could lead a jury to disbelieve his stated reasons.

CapTech used several criteria, including performance and an unexplained "other" category.  There was no comparative ranking of performance.  In Pavlicin's case, according to CapTech's witnesses, her performance was not a consideration. Significantly, no one could explain what the "other" factor was that was used as a reason to terminate her.

Although a RIF can, when applied fairly, result in the lawful termination of competent employees, it can be a pretext for terminating employees for discriminatory reasons.  Because there are numerous contradictions and inconsistencies about why CapTech terminated Pavlicin, a jury could reasonably find that she was fired because of her disability.  Thus, CapTech is not entitled to summary judgment as to Pavlicin's ADA discrimination claim.

### ADA Failure to Accommodate Claim

Discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an [] employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A).  In other words, discrimination under the ADA "encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for a plaintiff's disabilities." *Haberle v. Troxell*, 885 F.3d 170, 180 (3d Cir. 2018) (quoting *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999)).

To establish an ADA failure to accommodate claim, Pavlicin must prove: (1) she was disabled; (2) CapTech knew it; (3) she requested an accommodation or assistance; (4) her employer did not make a good faith effort to assist; and (5) she could have been reasonably accommodated. *Capps v. Mondelez Glob., LLC*, 847 F.3d at 157. Leave may be a reasonable accommodation under the ADA. *Id.* at 156–57 ("[A] request for FMLA leave may qualify, under certain circumstances, as a request for a reasonable accommodation."); *see also Conoshenti v. Public Serv. Elec. & Gas Co.*, 364 F.3d 135, 151 (3d Cir. 2004).

CapTech claims Pavlicin never requested an accommodation for her disability. In response, Pavlicin argues that her November 2, 2022, email to the Benefits Department was a request for a medical leave of absence as an accommodation for her disability. It was not. She sought "information on long term leave" and inquired "what the process is for taking leave."[74] She did not request an accommodation.

Q: At any point in time, did you request an accommodation for your dialysis or thereafter?

A: No, I didn't need to.

Q: Okay. You didn't feel that you needed a medical accommodation while you were working there?

…

A: At the time, no, because I was getting my work done.[75]

---

[74] Pl.'s Ex. 10, Pavlicin Email Nov. 2, ECF No. 32-14.

[75] Pavlicin Dep. 153:21–154:8, ECF Nos. 30-4, 32-5.

More importantly, she emailed Davis on February 24, 2023, confirming she was "ready willing, and able to work."[76]

It is undisputed that Pavlicin did not make a request for accommodation CapTech could have denied. Therefore, CapTech is entitled to summary judgment as to the ADA failure to accommodate claim.

### *ADA Retaliation Claim*

Pavlicin's retaliation claims are also governed by the *McDonnell Douglas* framework. *See Canada v. Samuel Grossi & Sons, Inc.*, 49 F.4th 340, 346 (3d Cir. 2022). She must first make out a *prima facie* case of retaliation.

To state a claim for ADA retaliation, she must show: (1) she engaged in a protected activity; (2) she was subjected to a materially adverse employment action; and (3) there was a causal connection between the adverse employment decision and her protected activity. *Id.* Under the ADA, a request for an accommodation is considered a protected activity. *See Shellenberger*, 318 F.3d at 190–91.

Pavlicin attempts to transform her request for information about FMLA leave into a request for an accommodation. We have already determined that Pavlicin did not request an accommodation to allow her to work.

Pavlicin has failed to make out a *prima facie* case for ADA retaliation. Thus, we shall grant CapTech summary judgment on Pavlicin's ADA retaliation claim.

---

[76] Pl.'s Ex. 31, Pavlicin Email Feb. 24, ECF No. 32-35.

### FMLA Retaliation[77]

To prevail on a claim for FMLA retaliation, Pavlicin must prove: (1) she invoked her right to FMLA qualifying leave; (2) she suffered an adverse employment decision; and (3) the adverse employment decision was causally related to her invocation of rights. *Lichtenstein v. Univ. of Pitts. Med. Ctr.*, 691 F.3d 294, 301–02 (3d Cir. 2012) (citing *Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 508–09 (3d Cir. 2009)).

"[T]he 'critical test' is not whether the employee gave every necessary detail to determine if the FMLA applies, but 'how the information conveyed to the employer is reasonably interpreted.'" *Lichtenstein*, 691 F.3d at 303 (quoting *Sarnowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398, 402 (3d Cir. 2007)). Pavlicin informed CapTech she would need a three-month leave to recover from her expected transplant surgery. Gill responded with instructions for submitting a request for FMLA leave. Although it was not certain when she would need leave, it was certain that she would need it. Gill's response was an acknowledgement of that need. Thus, Pavlicin's inquiry was an invocation of FMLA rights.

Firing an employee after requesting FMLA leave but before the employee could take it can constitute both interference and retaliation. *Erdman*, 582 F.3d at 509; *see Capps*, 847 F.3d at 156 n.11. That is what happened here. Pavlicin sought information about leave that she intended to take for a kidney transplant. At the time, she did not submit a leave request via CapTech's leave vendor. But, her requesting information and

---

[77] *See Garcia v. Vertical Screen*, 592 F. Supp. 3d 409, 422 (E.D. Pa. 2022) ("Garcia brings retaliation claims under the ADA, PHRA, FMLA, and Title VII. The elements of retaliation under these four statutes are essentially the same…."); *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 382 (3d Cir. 2002); *Capps v. Mondelez Glob. LLC*, 147 F. Supp. 3d 327 (E.D. Pa. 2015), *aff'd*, 847 F.3d 144 (3d Cir. 2017).

informing CapTech that she intended to take leave once she had a transplant were enough to show that she would be taking leave. Before she could take leave, she was terminated.

Pavlicin may establish a causal connection between her invocation of FMLA rights and her inclusion in the RIF through evidence of unusually suggestive temporal proximity, a pattern of antagonism coupled with timing, or other facts supporting an inference of causation. *Lichtenstein*, 691 F.3d at 307. She has done so.

CapTech argues that three months between her leave inquiry and her termination militates against a finding of temporal proximity. We have held that a period of two months does not preclude a finding of causal connection. *See e.g., Coffman v. Grand View Health Found.,* LLC, Civil Action No. 23-2073, 2024 WL 1546941, at *5 (E.D. Pa. Apr. 9, 2024) (citing *Fasold v. Justice*, 409 F.3d 178, 189–90 (3d Cir. 2005)); *United States ex rel. Rose v. Select Rehab., LLC*, 668 F. Supp. 3d 368, 374 (E.D. Pa. 2023).

Here, the circumstances surrounding CapTech's termination of Pavlicin three months after she made her leave inquiry does not preclude a causal connection. A reasonable juror could infer the RIF provided a mechanism to part with employees who would require future leave. The evidence suggests that DeHaven knew of Pavlicin's need for leave in the future and he, along with others, delayed termination to avoid the appearance of a connection. Feldmann's text to Bray can be interpreted as a suggestion that CapTech should delay Pavlicin's termination to avoid litigation. She wrote, "She is going to need 2-3 months off to recover. It's going to be hard [to] staff that, but also I don't want to intentionally not staff her and bring in a lawsuit."[78]

---

[78] Pl.'s Ex. 16, Bray/Feldmann Text Messages, DEF 04720, ECF No. 32-20.

It is undisputed that on February 1, 2023, CapTech knew about Pavlicin's need for leave.  One could argue CapTech paused her termination to help facilitate leave for her transplant before letting her go.  So could one claim the pause was to avoid the appearance of a causal connection between her future leave and her termination. Resolving which was the actual reason is for the factfinder.

Unwilling to wait until a donor kidney became available, CapTech offered her three options.  She did not respond to CapTech's offer because she felt the options were unrealistic because she was not yet disabled.  Her failure to apply for short-term disability cannot justify terminating her.

Without a present need for short-term disability, Pavlicin was left with either taking an unpaid leave of absence for 12 weeks and keeping benefits during that time or being terminated with subsidized COBRA for six months.[79]  These options were unrealistic because of the uncertainty of when her transplant would occur.  Neither option left open her remaining a CapTech employee.

A jury could conclude that CapTech wanted her out for requesting future leave and her firing was causally related to her invoking her FMLA rights.  Therefore, CapTech is not entitled to summary judgment as to Pavlicin's FMLA retaliation claim.

### FMLA Interference

To succeed on her FMLA interference claim, Pavlicin must prove: (1) she was an eligible employee under the FMLA; (2) CapTech was subject to the FMLA; (3) she was entitled to FMLA leave; (4) she gave notice to CapTech of her intention to take FMLA leave; and (5) she was denied benefits to which she was entitled under the FMLA.  *Ross*

---

[79] Pl.'s Ex. 32, Davis Email Mar. 7, DEF 00282, ECF No. 32-36.

*v. Gilhuly*, 755 F.3d 185, 191–92 (3d Cir. 2014).  An interference action is not about discrimination, it is about whether the employer provided the employee with the leave guaranteed by the FMLA.  *Capps*, 847 F.3d at 155 (quoting *Callison v. City of Phila.*, 430 F.3d 117, 120 (3d Cir. 2005)).  The employee need only prove that the employer denied her leave under the Act.  *Id.*

CapTech argues Pavlicin was not denied FMLA benefits.[80]  It correctly points out that she never submitted a specific FMLA request with an anticipated start or end date.[81]  But, Gill had suggested that she could wait to submit a leave request when the date of her transplant became known.  As we discussed relative to her FMLA retaliation claim, the November 2, 2022, email sufficed as notice to CapTech of her intention to take FMLA leave.  Admittedly, the inquiry was general in nature and no formal claim was submitted.  But, CapTech knew FMLA leave was coming.  Before the need for leave became a reality, CapTech terminated her.

Pavlicin's medical situation was atypical.  She provided CapTech with as much information about her pending transplant as possible.  There was no doubt she would be taking leave.  The only uncertainty was when she would be taking it.

A reasonable jury could find CapTech was aware of her intention to take FMLA leave when a donor kidney became available and its decision to terminate her before she needed leave constituted a denial of leave.  Thus, CapTech is not entitled to summary judgment as to Pavlicin's FMLA interference claim.

---

[80] Def.'s Mot. Summ. J. 16, ECF No. 30.

[81] Pl.'s RSUMF ¶ 19, ECF No. 32-3.

**Conclusion**

CapTech's motion for summary judgment is denied in part and granted in part. The motion is denied as to Pavlicin's ADA discrimination, FMLA retaliation, and FMLA interference claims. The motion is granted as to her ADA retaliation and failure to accommodate claims.